Harold R. Forton v. Commissioner.
Forton v. Commissioner
Docket No. 29920.
United States Tax Court
T.C. Memo 1954-102; 1954 Tax Ct. Memo LEXIS 142; 13 T.C.M. (CCH) 675; T.C.M. (RIA) 54208; July 23, 1954, Filed *142 Pursuant to a promise to assign to her a 75 per cent interest in any inventions, petitioner's wife financed petitioner's experiments. Petitioner, his wife, and others entered into a partnership agreement for the purpose of collecting the royalty income from the patents on the resulting invention. Held, the respondent erred in including in petitioner's gross income his wife's distributable share of the partnership income. Geo. E. H. Goodner, Esq., Munsey Building, Washington, D.C., and Dewey R. Roark, Jr., Esq., for the petitioner. Clarence E. Price, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in petitioner's income taxes of $3,960.04 for 1944, $7,753.75 for 1945, and $3,420.56 for 1946. The petitioner does not contest certain adjustments. The issue for decision is whether the Commissioner properly included in petitioner's income for the taxable years involved the pro rata share of the net earnings of a partnership known as Greenback Industries which, according to the partnership agreement, was distributable to petitioner's wife. Findings of Fact During the taxable years involved *143 petitioner, Harold R. Forton, was a resident of Greenback, Tennessee, and filed his individual income tax returns with the collector of internal revenue for the district of Tennessee. Petitioner and Margaret E. Forton were married in 1929 when he was 20 and she was 19 years of age. Petitioner was then working in a grocery store in Detroit, Michigan. He was also associated with a dentist in attempting to develop a new process for the reproduction of artificial plates based on metal construction. Petitioner, who had completed only one year of high school, did a considerable amount of reading in the public library in connection with his experiments. In 1928 or 1929 he became interested in a series of technical articles by Dr. Shupe of Switzerland describing a process which had been developed for depositing minute molten metal particles by a blast of compressed air to build up a solid mass without dimensional change. Petitioner believed that the process could be adapted for use in the dental industry and began making experiments toward this end. During the latter part of 1930 the dentist with whom petitioner was associated decided that he could go no further with the experiments. Thereafter, *144 petitioner carried on the work alone and financed it from his own savings, the proceeds of his father's life insurance, and the money he earned on weekends. During this time petitioner, because of his financial situation, slept in the basement of a building and his wife went to live with her parents. In 1931 petitioner ran out of money with which to continue experimenting. After unsuccessful attempts to interest various individuals in the project, petitioner asked his wife, who had a job, to finance his experiments. He promised her in return a 75 per cent interest in anything obtained as a result of his work, and she consented. On June 11, 1931, petitioner and his wife borrowed $200. The greater portion of this loan was repaid by petitioner's wife. She also gave to petitioner a portion of her weekly income of from $20 to $22. The money was used by petitioner to purchase small pieces of equipment, necessary supplies, and food to eat. In September 1934 petitioner and his wife were still in debt. By that time petitioner had developed a device which had possibilities, but as petitioner and his wife no longer felt able to finance the project, it was abandoned. Petitioner obtained *145 a full-time job, and he and his wife reestablished their home. Petitioner's wife continued to work, however, until 1938 or 1939. Eight or nine months after the project was abandoned, petitioner was approached by a dentist who said he could interest others in financing petitioner's work. A preliminary agreement was entered into in July 1935 which was superseded by an agreement executed in September 1935. The parties to the latter agreement included petitioner, his wife, and four others. The agreement provided that petitioner would obtain in his own name patents on the device he had developed for spraying molten metal. He would then grant to a proposed corporation the exclusive right to manufacture and sell the device. In return, Eli Levin, one of the financial backers, promised to advance to the proposed corporation $2,500 and, if the corporation needed more money, to advance an additional $2,500. Subsequent to the execution of the above agreement of September 1935, petitioner and his wife decided to reduce to writing their oral agreement of 1931. This was done in order that there would be no misunderstanding in the event something happened to petitioner. The agreement was set forth *146 in petitioner's handwriting on the back of their copy of the September 1935 agreement. The agreement reads as follows: "Oct. 1935 "The following agreement is made between Margaret Forton and Harold Forton, both residents of Detroit, Michigan. This agreement is made and based on the verbal understanding by both parties which took place in years 1933, 1934, and 1935. "Whereas Harold Forton has been working on methods and process for spraying molten metal, and finds he can no longer continue due to lack of money "Whereas, Margaret Forton is employed and has money of her own and "Whereas Margaret Forton is willing to invest her money and willing to borrow more to invest in order for Harold Forton to carry on with this development and work, "Now therefore in consideration of the premises, the mutual promises of the parties, it is agreed by and between the parties named above that Margaret Forton agrees to advance all of the money she can spare and all she can borrow to carry on the development of the Spraying device. "Harold Forton agrees to assign and transfer to Margaret Forton a (75%) Seventy-Five percent in any and all patents to be granted to him and to so notify anyone *147 putting up money to promote same, that Margaret Forton is to receive 75% of the proceeds, for her interest. "Dated in Oct. 1935. "(Sgd.) Harold Forton "Agreed to by (Sgd.) Margaret Forton" Thereafter a Michigan corporation known as the Detroit Metal Spray Company was formed pursuant to the September 1935 agreement. One hundred shares of stock were issued. Petitioner received seven shares and his wife received eighteen shares. Petitioner became the president of the corporation, applied for patents upon the device in his own name, and licensed the corporation to manufacture and sell the device. A number of the machines were sold. As a by-product the machine created a "dust" condition which the dental association claimed was a health hazard. It was this "dust" by-product which later proved to be the value of the patents in the production of metallic powders. Thereafter the corporation encountered stiff sales resistance. The corporation never made any money or paid any dividends. In 1937, a little over a year after the corporation was formed, it ran out of money and went out of business. The license agreement was cancelled. Petitioner returned to his job in a grocery store *148 and, off and on, worked on the device, trying to improve it. In the latter part of 1942 petitioner was approached by Howard A. Miller, an employee of McAleer Manufacturing Company (hereinafter referred to as McAleer). Miller stated that McAleer needed large quantities of metal powders in filling Government contracts and asked petitioner if such powders could be produced with his patented device. When petitioner informed Miller that it could be done, Miller introduced petitioner to Earl Lowe, vice-president of McAleer. On January 28, 1943, petitioner, Miller, and Lowe entered into an agreement whereby Lowe agreed to advance up to $2,000 for the adaptation of petitioner's patented device to the production of metallic powders. The agreement further provided that, if petitioner and Miller were successful in adapting the device, then Lowe would attempt to procure a manufacturer and any profits would be equally divided among petitioner, Lowe, and Miller. On November 27, 1943, petitioner granted McAleer an exclusive license to manufacture, use, and sell metallic powders produced with petitioner's patented device. Lowe entered into a profit-sharing contract with McAleer, and a new agreement *149 wherein the interest of petitioner's wife in the invention was recognized, was reached relative to the distribution of profits. The agreement, which was reduced to writing on December 30, 1944, provided as follows: "ARTICLES OF PARTNERSHIP of the GREENBACK INDUSTRIES "Preamble "The original formation of this partnership occurred in reality in November, 1943, at which time the respective interests of the parties hereto were fixed and contributed; and said partnership having continued from that date on through the year 1944 as thus established, the partners deem it proper and advisable to formally establish the Articles of Partnership among them, and they, therefore, do hereby declare and agree: "ARTICLE I "The business of this partnership shall be conducted and carried on under the partnership name, style and firm of "Greenback Industries." "ARTICLE II The partnership shall exist for the purpose of collecting the income or royalties from a certain profit-sharing contract between Earl Lowe and the McAleer Manufacturing Company of Rochester, Michigan, and the income from a certain license agreement between Harold R. Forton and said McAleer Manufacturing Company, both *150 of said contracts being based upon certain patents for the manufacture of metallic powder, said patents being the absolute property of said Harold R. Forton. Should the licensing contracts above described for any reason or at any time be cancelled or terminated it is understood this partnership would thereby have no further interest in or income from said patents. And for the purpose of collecting the income or royalties from such other agreements or property as said partnership may hereafter from time to time own or operate. * * *
"ARTICLE IV "The names of the members of this partnership and the percentage of each partner's interest in the profits which shall be derived from the business, and the percentage of each partner's liability for any losses which may be suffered by the partnership, are as follows: Percent of
"Name of Partner
Profit or Loss
Harold R. Forton,
Greenback, Tennessee
8 1/3%
Margaret E. Forton,
Greenback, Tennessee
25%
Howard A. Miller,
Greenback, Tennessee
8 1/3%
Estella B. Miller,
Greenback, Tennessee
25%
Earl Lowe,
Birmingham, Michigan
8 1/3%
Ruth M. Lowe,
Birmingham, Michigan
25%
* * *
"WITNESS our hands *151 this the 30 day of Dec. 1944. "(Signed) Harold R. Forton, Margaret E. Forton, Howard A. Miller, Estella B. Miller, Earl Lowe, Ruth M. Lowe" During 1944 the partnership did not own any physical assets or pay any salaries. It realized in that year a net profit of $36,830.10 on the license agreement and the profit-sharing contract with McAleer. The money was paid to petitioner and deposited in his personal account in the Merchants & Farmers Bank in Greenback, Tennessee. The money was then distributed among the parties to the agreement of December 30, 1944 in the manner provided in that agreement. Petitioner's wife received petitioner's personal check dated December 28, 1944 for $9,207.52 and petitioner retained $3,069.18 as his share of the profits. On April 17, 1945, petitioner and his wife assigned to the partnership all their rights in the patents on the device. During 1945 the partnership built and operated a manufacturing plant. It paid salaries of $2,500 to petitioner and $2,400 to Miller. The partnership net profit for the year, after salaries, was $54,291.79. Because of a need for capital, the only withdrawals were made by the three wives who each withdrew $3,130.30. Under *152 the terms of the December 30, 1944 agreement the distributive shares of petitioner and his wife in the 1945 partnership earnings were $4,524.32 and $13,572.95, respectively. In January 1946 Miller and his wife withdrew from the partnership. The remaining partners agreed to pay to the Millers for their partnership interests the Millers' undistributed shares of the 1945 partnership earnings. In 1946 petitioner received a salary from the partnership of $9,000. The partnership's net income for the first nine months of 1946 was $22,776.61. The distributive shares of petitioner and his wife in the partnership income for the first nine months of 1946 were $3,796.10 and $7,592.20, respectively. [1]
By August 1946 the decision was reached to form a corporation to carry on the business then being conducted by the partnership. Miller's wife agreed to accept stock in the new company in lieu of the $4,671.81 balance due her for her partnership interest. A corporation was formed under the name of Greenback Industries, Inc. *153 , and on September 18, 1946, the partnership transferred all of its physical assets to the corporation. The corporation issued 22,004 shares of stock having a par value of one dollar per share, as follows: Name
Number of Shares
H. A. and Estella B. Miller
4,672
Earl Lowe
2,167
Ruth M. Lowe
6,499
Margaret Forton
6,499
H. R. Forton
2,167
The stock was held by the partnership. The partners did not sell the patents on the device to the corporation until the latter part of 1947. The money received by petitioner and his wife was intermingled in a joint account and in a joint safety deposit box. Petitioner's wife used some of the money to purchase a farm and to make other investments in her own name. Respondent determined that the partnership income distributable to both petitioner and his wife in the taxable years 1944, 1945, and 1946, was taxable to petitioner. Opinion Respondent included in petitioner's taxable income for the years in question partnership earnings which were distributable to petitioner's wife. Petitioner assails this determination, contending that his wife was a valid partner for tax purposes. He argues that his wife acquired a 75 per *154 cent interest in a certain patented invention by fulfilling her agreement to finance his experiments, and alleges that she conveyed this interest to the partnership. Petitioner contends that the partnership derived its income from the patented invention, and, therefore, his wife's share of the partnership earnings should not be included in his gross income. Respondent denies that petitioner agreed to assign to his wife a 75 per cent interest in any invention if she would finance his experiments. Therefore, respondent contends that petitioner's wife did not acquire a legally enforceable interest in the invention, that she was not a partner as defined by [733]; and that the partnership agreement was nothing more than an arrangement for the division of past and future income, which, under , is ineffective for tax purposes. The principal controversy is whether petitioner's wife obtained an interest in the invention which is recognizable for tax purposes. Primarily this is a question of fact which, for the most part, is resolved by our finding that petitioner did promise his wife a 75 per cent *155 interest in any invention if she would finance his experiments, that for three years during the height of the depression she gave him money in order that he might continue these experiments, and that the invention, which was the principal partnership asset, resulted from these experiments. A similar situation was presented in , and in . There the taxpayer orally promised his wife or daughter an interest in any invention if she would aid him with his experiments. This Court held that the wife or daughter acquired an equitable property interest in the resulting invention and held that royalty payments received on the invention, whether received directly or through a partnership, were not includible in the taxpayer's gross income to the extent of his wife's or daughter's interest in the invention. In our opinion the above cases are controlling. Respondent attempts to distinguish the Kuzmick and Dreymann cases because petitioner's wife financed petitioner's work rather than aided him with his experiments. We deem this difference immaterial. We also disagree with respondent's contention that petitioner *156 did not in good faith offer his wife a 75 per cent interest in future inventions. Petitioner in arms-length transactions made similar concessions to others. In 1935 he was willing to relinquish a 75 per cent interest in the invention to outsiders in return for financial assistance, and, in 1943, he relinquished a two-thirds interest in the invention to Lowe and Miller for advancing up to $2,000 for the adaptation of the device to the production of metallic powders and obtaining a license agreement with McAleer. Therefore, it is not incredible that petitioner, in 1931, when money was tight and his invention was in an embryonic stage, made a bona fide offer to assign to his wife a 75 per cent interest in any invention if she would finance his experiments. Petitioner did not retain sufficient power and control over his wife's interest in the invention or over the receipt of the income therefrom to come within the rule of . In that case the taxpayer gratuitously assigned to his wife the rights under a license agreement which he retained the power to cancel. Here petitioner's wife received in return for her financial assistance an indefeasible *157 property interest in the invention itself. Respondent contends that petitioner's wife was not mentioned in the patent applications and in the initial contract with Lowe and Miller. Although respondent's contentions are correct, we do not believe this negatives the fact that petitioner made a valid assignment of a 75 per cent interest in the invention to his wife. Cf. Carl G. Dreymann and Paul L. Kuzmick, both supra. The partnership existed for the purpose of collecting royalties on the profit-sharing contract and licensing agreement with McAleer based upon petitioner's patents. Petitioner's wife owned a 75 per cent interest in the partnership's income-producing asst, and this interest, in a very real sense originated with her. Cf. She joined in the agreement to exploit this asset, and we hold, therefore, that the respondent erred in including in petitioner's gross income his wife's distributable share of the partnership income. Decision will be entered under Rule 50. Footnotes
1. The partnership also received a long-term capital gain of $77.35 of which one-sixth was distributable to petitioner and one-third was distributable to his wife.↩